UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

THE LANDS COUNCIL, a
Washington nonprofit
corporation, HELLS CANYON
PRESERVATION COUNCIL, an
Oregon nonprofit corporation,
OREGON NATURAL RESOURCES
COUNCIL, an Oregon nonprofit
corporation, and SIERRA CLUB,
a California nonprofit
corporation,

          Plaintiffs,

      v.

KEVIN MARTIN, Forest
Supervisor of the Umatilla
National Forest, and the
UNITED STATES FOREST SERVICE,
an agency of the United
States Department of
Agriculture,

          Defendants,

      and

AMERICAN FOREST RESOURCE
COUNCIL, an Oregon
corporation; BOISE BUILDING
SOLUTIONS MANUFACTURING, LLC,
a Washington limited
liability company; and Dodge
Logging, Inc., an Oregon
corporation,

          Defendant-Intervenors.

NO. CV-06-0229-LRS

ORDER DENYING PLAINTIFFS'
MOTION FOR TEMPORARY
RESTRAINING ORDER AND
PRELIMINARY INJUNCTION

ORDER ~ 1

## I.  Introduction

Having exhausted their administrative remedies, Plaintiffs filed this suit in the district court on August 15, 2006.  On August 30, 2006, the Court heard oral argument on the Motion for Temporary Restraining Order and Preliminary Injunction (Ct. Rec. 2), filed on August 16, 2006 by Plaintiffs Lands Council, Hells Canyon Preservation Council, Oregon Natural Resources Council, and the Sierra Club.

Other motions also pending include Motions to Expedite (Ct. Recs. 21, 31) and Motion to Intervene (Ct. Rec. 22) filed by American Forest Resource Council, Boise Building Solutions Manufacturing, LLC, and Dodge Logging, Inc.; American Forest Resource Council, Boise Building Solutions Manufacturing, LLC, and Dodge Logging, Inc.; Motion to Appear Pro Hac Vice re Attorney Scott Horngren (Ct. Rec. 19); and Plaintiffs' Motion to Strike Second Declaration of Dean Millett, or in the Alternative, Permission to Submit Third Declaration of Dr. Edwin B. Royce and Additional Briefing (Ct. Rec. 58).

Ms. Karen S. Lindholdt and Mr. Ralph Bloemers appeared on behalf of Plaintiffs Lands Council, Hells Canyon Preservation Council, Oregon Natural Resources Council, and Sierra Club("Plaintiffs").  Ms. Beverly Li represented Defendant United States Forest Service ("USFS") and Mr. Scott Horngren represented Defendant-Intervenors American Forest Resource Council, Boise Building Solutions Manufacturing, LLC, and Dodge Logging, Inc. ("Intervenors").

After reviewing the submitted material, taking oral argument, and considering relevant authority, the Court is fully informed and

1  hereby denies Plaintiffs' Temporary Restraining Order and Preliminary
2  Injunction, Ct. Rec. 2.

3  **II. Factual Background**

4     In August 2005, the School Fire burned approximately 51,000
5  acres, about 28,000 acres of which were on the Umatilla National
6  Forest ("UNF"). Li Decl., Exh. B at 1-2. The School Fire was
7  characterized as a mosaic burn pattern, leaving areas untouched
8  adjacent to the burned areas according to the Plaintiffs. Plaintiffs
9  argue that many trees showed little, if any, sign of scorch or burn.
10 Defendants assert that about 15,380 acres of the total burned National
11 Forest lands may have experienced direct or immediate consequences of
12 fire-caused injury severe enough to kill 75% or more of the trees.
13 EIS at 1-3.

14    The entire School Recovery Project ("Project") – instituted in
15 response to the School Fire – area consists of an estimated 9,432
16 acres of burned woodland located in the Umatilla National Forest and
17 involves the salvage harvest of dead and dying trees and any trees
18 that present a danger to public safety. EIS at 1-6.

19    Development of the Project began in the fall of 2005. Ct. Rec.
20 34, at 2. On October 26, 2005, USFS published a Notice of Intent to
21 prepare an Environmental Impact Statement ("EIS"), 70 Fed. Reg. 61783
22 (Oct. 26, 2005). USFS also provided informational packets to 230
23 individuals and organizations, soliciting comments from the public on
24 the proposal. EIS at 2-2. USFS received and reviewed 24 scoping
25 comments. EIS at 2-4. On April 20, 2006, USFS released a draft EIS
26 on the Project, including all of the Plaintiffs. EIS at 2-3. USFS

1  received and responded to 22 of the comments on the Draft EIS for the

2  Project.  EIS at 2-4.

3       On July 10, 2006 the USFS completed and released a Final EIS

4  analyzing the potential environmental impacts of the proposed Project.

5  Ct. Rec. 34, at 3.  On July 31, 2006, the Forest Service Chief signed

6  an Emergency Situation Determination ("ESD") under 36 C.F.R. §

7  215.10(b) for the Milly, Oli and Sun sales that lie, according to

8  Defendants, in 3,674 acres of the most severely burned areas of the

9  Project.  This determination was based on substantial loss in economic

10 value of dead and dying timber if implementation of that portion of

11 the Project were delayed during the administrative appeals process

12 until November 2006.  Li Decl., Exh. G.  Such a delay, according to

13 Project Leader Dean Millett, would result in a potential loss in value

14 to the federal government of $1,547,000.  Millett Decl., §3.  On

15 August 14, 2006, the Forest Supervisor for the UNF signed the Record

16 of Decision approving the Project.  Exh. A to Li Decl.  On August 22,

17 2006, USFS auctioned the Milly, Oli and Sun salvage sales.  Musgrove

18 Decl., ¶2.

19      USFS provides (4) reasons as the "Purpose and Need" for this

20 Project:

21      1) recover "some economic value" for the community from the
        burned timber;
22      2) provide for timber harvest to help meet demand for wood
        products;
23      3) provide for a safe road trail system; and
        4) provide for the production of wood products "consistent
24      with various resource objectives and environmental
        constraints."

25

26

ORDER ~ 4

The Environmental Impact Statement ("EIS") for the Project consisted of (3) alternatives:

    1) Alternative A: No action

    2) Alternative B: Log 9,432 acres

    3) Alternative C: Log 4,188 acres.

The USFS selected Alternative B.  The EIS indicated that reforestation by hand planting would occur on the harvested acres that are outside danger tree areas.  Id.

Plaintiffs argue that the USFS failed to adequately analyze the environmental impacts of the Project.  More specifically, Plaintiffs argue that two significant roadless areas will be impacted by the Project.  Ct. Rec. 3, at 5. The West Tucannon roadless area is located to the West of the Willow Spring Inventoried Roadless Area ("Willow Springs IRA"). West Tucannon is separated from Willow Springs by forest road 47 and is close to 5,000 acres in size. The Upper Cummins Creek roadless area is immediately adjacent to the Southeast corner of Willow Springs, a roadless area of more than 10,000 acres.  Id.

Plaintiffs allege that Defendants have failed to comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321-4370, the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600-1614, the Administrative Procedures Act ("APA"), 5 U.S.C. § 501-706, and applicable implementing regulations in issuing the Project. Plaintiffs seek injunctive relief to prevent alleged irreparable injury to old growth stands, roadless areas, soils, and habitat for salmon, steelhead, Rocky Mountain Elk and a diverse range of protected species.  Ct. Rec. 3, at 3.

On August 18, 2006, the parties reached a stipulation regarding a briefing schedule that allowed the matter to be heard by the Court prior to ground disturbing activities.  The USFS agreed to stay all on-the-ground implementation of the Milly, Oli, and Sun Salvage Sales until September 2, 2006.  At the hearing on August 30, 2006, the parties reached another stipulation to stay all on-the-ground implementation of the Milly, Oli, and Sun Salvage Sales until September 12, 2006, while the Court took the case under advisement.

**III.  Motion to Intervene**

   A.   Timber Contractors-Applicants Dodge Logging and Boise
        Building Solutions Manufacturing, LLC

Intervenor applicants seek to intervene as of right or permissively pursuant to Federal Rule of Civil Procedure 24.

Timeliness is "the threshold requirement" for intervention as of right. *United States v. Oregon*, 913 F.2d 576, 588 (9th Cir.1990). Here, the action was filed on August 15, 2006, and the motion to intervene was filed on August 24, 2006.  This motion was brought at the outset of litigation, and on the same day as the filing of the response by the named defendants and prior to the issuance of a pretrial scheduling order or answer by the named defendants. See *Sierra Club v. U.S. E.P.A.*, 995 F.2d 1478, 1481 (9th Cir.1993) (upholding trial court's finding that application was timely where filed before defendant had filed its answer). There is no evidence that intervention by applicant will prejudice any existing party. Accordingly, the court finds that applicant's motion to intervene was timely filed.

ORDER ~ 6

In addition to filing a timely motion, applicants must show that they have an interest in the subject matter of the litigation. *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525, 527 (9th Cir.1983). The timber contractors Dodge Logging and Boise Building Solutions Manufacturing, LLC assert that they have been awarded contracts relating to the Project. Ct. Rec. 23 at 2.  The Ninth Circuit has explicitly held that ownership of projects that are involved in various stages of planning and implementation are sufficient to constitute legally protectable interests for the purpose of intervention as of right. *Berg*, 268 F.3d at 820 ("Contract rights are traditionally protectable interests.").  Because the Project's implementation is threatened by plaintiffs' claim for declaratory and injunctive relief, there is a clear connection between timber contractor applicants' protectable interest in the contracts and the relief sought by plaintiffs in the action. See id. Thus, the timber contractor applicants have asserted a protectable interest in their respective contracts that could be affected by the relief sought by plaintiffs.

Finally, the applicants for intervention must demonstrate that the party on whose side it seeks to intervene is not capable or willing to make the intervenor's arguments. *See Idaho Farm Bureau Fed'n*, 58 F.3d at 1398. "The burden of making this showing is minimal." *Pacific Gas & Elec. Co. v. Lynch*, 216 F.Supp.2d 1016, 1025 (N.D.Cal.2002) (citing Sagebrush Rebellion, 713 F.2d at 528). Applicants may satisfy this burden by demonstrating that the representation of their interests may be inadequate. *Trbovich v.*

ORDER ~ 7

*United Mine Workers*, 404 U.S. 528, 538 n. 10 (1971).  The Ninth Circuit considers three factors in determining the adequacy of representation: (1) whether the interest of a present party is such that it will undoubtedly make all of a proposed intervenor's arguments; (2) whether the present party is capable and willing to make such arguments; and (3) whether a proposed intervenor would offer any necessary elements to the proceeding that other parties would neglect.  *Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir.2003) (*citing California v. Tahoe Reg'l Planning Agency*, 792 F.2d 775, 778 (9th Cir.1986)).

The named defendants in this action are government entities and officials.  These defendants do not have the same type of vested economic interest in the litigation as the timber contractors. Therefore, because the named defendants have different interests than the timber contractors, if plaintiffs prevail, it is likely that defendants will not advance the same arguments as the timber contractors in regards to potential remedies. *See Berg*, 268 F.3d at 824. Therefore, there is sufficient doubt about the adequacy of representation to warrant intervention in the remedial portion of the litigation. *See id.* (citations and quotations omitted).  The Court grants Dodge Logging and Boise Building Solutions Manufacturing, LLC's requests to intervene as a matter of right.

B.    Applicant American Forest Resource Council

As to American Forest Resource Council ("AFRC"), it desires to intervene because this lawsuit seeks to halt the Project.  AFRC is a not-for-profit organization representing wood products companies and

owners of timber land throughout the west.  The Court finds that AFRC's request falls more closely within the parameters of permissive intervention pursuant to Rule 24(b).   In order to intervene permissively, AFRC must prove that it meets three threshold requirements: (1) the court has an independent basis for jurisdiction; (2) the motion is timely; and (3) applicant shares a common question of law or fact with the main action. Fed.R.Civ.P. 24(b). AFRC has minimally satisfied the threshold requirements for permissive intervention. However, intervention pursuant to Rule 24(b) is within the trial court's discretion and must take into account the prejudice to the original parties, including the potential for undue delay. Therefore, the Court grants AFRC's request to intervene under Rule 24(b) and its discretionary powers.

**IV. Preliminary Injunction Standard**

A preliminary injunction is an extraordinary remedy.  *Weinberger v. Romero-Barcelo*, 102 S. Ct. 1798, 1803 (1982); *Hawaii County Green Party v. Clinton*, 980 F.Supp. 1160, 1167 (D. Hawaii 1997). In the Ninth Circuit, a court may grant such a remedy if a plaintiff "demonstrates either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor." *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1120 (9th Cir. 2005) (*quoting Johnson v. Cal. State Bd. of Accountancy*, 72 F.3d 1427, 1430 (9th Cir.1995)). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Roe v. Anderson*,

134 F.3d 1400, 1402 (9th Cir. 1998) *(quoting United States v. Nutri-cology, Inc.*, 982 F.2d 394, 397 (9th Cir. 1992)). Plaintiff, as the party seeking injunctive relief, bears the burden of demonstrating these factors justifying relief by clear and convincing evidence. *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 441 (1974).

"Injunctive relief is an equitable remedy, requiring the court to engage in the traditional balance of harms analysis, even in the context of environmental litigation." *Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1496 (9th Cir. 1995). The Supreme Court has held that insufficient evaluation of environmental impact under NEPA does not create a presumption of irreparable injury. *See Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987). However, the Ninth Circuit observed "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Idaho Sporting Cong. Inc. v. Alexander*, 222 F.3d 562, 569 (9th Cir. 2000) (*citing Amoco*, 480 U.S. at 545). Therefore, "when the environmental injury is 'sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment.'" *Id.* Irreparable harm is defined as an actual or concrete harm, or the imminent threat of an actual or concrete harm. *Los Angeles Memorial Coliseum Comm'n v. National Football League*, 634 F.2d 1197, 1200 (9th Cir. 1980).  A threat of harm will not be considered "imminent," if it is based on merely remote possibilities

ORDER ~ 10

or speculation.  *Carribean Marine Serv. Co. v. Baldridge*, 844 F.2d 668, 675 (9th Cir.1988).

In reviewing the USFS's compliance with NEPA and NFMA, the court must determine whether the agency's actions were "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law." *Or. Nat. Resources Council v. Loew*, 109 F.3d 521, 526 (9th Cir. 1997).  Review under such a standard is narrow and highly deferential, only requiring the agency to "articulate a rational connection between the facts found and the conclusions made." Id. The Ninth Circuit requires that a challenge to a decision to not prepare an initial EIS must be reviewed under the arbitrary and capricious standard. *Greenpeace Action*, 14 F.3d at 1331. Given the narrowness of the standard of review, the Court recognizes it may not substitute its own judgment for that of the agency concerning the wisdom or prudence of a proposed action. *W. Radio Services Co., Inc. v. Glickman*, 113 F.3d 966, 970 (9th Cir. 1997).

**V.  Analysis**

From Plaintiffs' perspective the motion before the Court involves restraining defendants from awarding any contracts for logging and road building in the Milly, Oli and Sun Salvage sales and otherwise implementing any portion of the School Fire Salvage Recovery Project to prevent irreparable injury to: 1) old growth stands; 2) roadless areas; 3) soils; and 4) habitat for endangered species of salmon, steelhead, Rocky Mountain Elk, and a diverse range of protected species.  Plaintiffs believe through expert opinion that Dr. Royce's survey and conclusion that "64% of trees designated for harvest had a

good probability for survival." First Royce Decl., ¶83. Dr. Royce later states in his Second Declaration that it can be "inferred" that over half of the trees in the Oli sale area have a high probability of surviving if not harvested. Second Royce Decl., ¶13. For the Sun sale, Dr. Royce later asserts that it can be inferred that over one third of the trees in the sale area have a high probability of surviving if not harvested. Id. ¶14. For the Milly sale area, Dr. Royce later asserts that it can be inferred that over half of the trees in the sale area have a high probability of surviving if not harvested. Id. ¶15.

From the USFS's perspective this decision involves the harvest of timber on approximately 3,657 acres in the Milly, Oli and Sun sale areas. Defendants state that greater than 95% of the trees are dead in the salvage cutting units in these three sales. Walker Decl., ¶8.[1]

---

[1]Paragraph 8 of the Walker Declaration states, in pertinent part:

> As described above, during project planning and in preparation of the ESD, we targeted stands that had 90 percent or greater mortality (based on post-fire field reconnaissance and infrared digital ortho photographs). In a random sample of the units that I inspected in the field, I found that greater than 95 percent of the trees in these stands were clearly dead (Digital images and audio files related to field review work are located in the FEIS Project Record). As stated in the FEIS (Appendix B, page B-1), dead trees were identified by (1) blackened boles and the complete absence of needles, (2) crowns having all brown needles, or (3) crowns having "fading" or "dry-appearing" (off-color) green needles throughout the crown. I observed that within the approximate five percent of the trees with green needles, approximately half were clearly alive and were not designated for removal.

ORDER ~ 12

Only 2 to 3 percent of the trees in the Milly, Oli and Sun sale units had green needles and were rated for survival using the Scott Guidelines[2].  Id., ¶8.  Trees with a low likelihood of survival were designated for harvest.  Id.  Those trees that were rated as highly likely to survive were designated for retention.  Id.  The small percentage that rated moderate and had two or more quadrants of live cambium were designated for retention.  Id.  No other sales are at issue in this motion for preliminary injunction.  The remaining salvage sales are not expected to be ready for harvest until 2007, after any administrative appeal process has been completed.  Martin Decl., ¶3.

    A.  Evidence Considered

    This Court considered, in this action, the following evidence:

        1.1  Civil Action Complaint;
        1.2  Memorandum in Support of Motion for Temporary Restraining Order and Preliminary Injunction;
        1.3  Declaration by Mike Petersen;
        1.4  Declaration by Ralph Bloemers;
        1.5  Declaration by Jon Rhodes;
        1.6  First Declaration by Dr. Edwin Royce;

---

[2]The Scott Guidelines rate trees as having a low, moderate or high probability of survival.  Ct. Rec. 34, n. 3 (citing EIS App. B-3).  Trees that have a low probability of survival can be harvested if they are not needed to meet other resource objectives such as wildlife habitat.  Id. (citing EIS App. B-4).  Under the EIS, for trees that rate as moderate, the cambium should be evaluated on four sides of the base of the tree and the tree may be removed, subject to other resource needs, only if the cambium is dead on at least three sides.  Id. at B-4 to B-5.

1.7  Declaration by Erik Fernandez;
1.8  Memorandum in Support of Motion to Intervene;
1.9  Declaration by John Fullerton;
1.10 Declaration by Richard Schaefer;
1.11 Declaration by Richard Dodge;
1.12 Intervenor Applicants' Memorandum of Points and Authorities in Opposition to Motion for Temporary Restraining Order and Preliminary Injunction;
1.13 Intervenor Applicants' Answer to Complaint;
1.14 Declaration by Shay S. Scott;
1.15 Defendants' Memorandum in Opposition to Motion for Temporary Restraining Order and Preliminary Injunction;
1.16 Declaration by Beverly Li;
1.17 Declaration by Philip Musgrove;
1.18 Declaration by Kevin Martin;
1.19 Declaration by Randall Walker;
1.20 Declaration by Dean Millett;
1.21 Declaration by Scott W. Horngren;
1.22 Affidavit by Edward J. Bruya
1.23 Second Declaration by Philip Musgrove
1.24 Reply Memorandum Re Motion for Temporary Restraining Order and Preliminary Injunction;
1.25 Second Declaration by Edwin Royce;
1.26 Declaration by Sean Malone;
1.27 Declaration by Ernest Niemi;
1.28 Second Declaration Ralph Bloemers;
1.29 Third Declaration by Ralph O. Bloemers;
1.30 Second Declaration by Dean R. Millett;
1.31 Third Declaration by Dr. Edwin B. Royce; and
1.32 Memorandum in Support of Plaintiffs' Motion to Strike Second Declaration of Dean Millett.

B.   NEPA VIOLATION

NEPA is the "national charter for protecting the environment." 40 C.F.R. §1500.1(a).  It requires all federal agencies to prepare an environmental impact statement (EIS) for "major federal actions significantly affecting the quality of the human environment."  42 U.S.C. §4332(C).  NEPA is procedural in nature and does not require "that agencies achieve particular substantive environmental results." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371, 109 S.Ct. 1851 (1989).  Instead, it requires agencies to collect, analyze and

ORDER ~ 14

1  disseminate information so that "the agency will not act on incomplete

2  information, only to regret its decision after it is too late to

3  correct."  Id.

4      Courts may not "fly-speck" an EIS and must employ a rule of

5  reason.  Swanson v. U.S. Forest Service, 87 F.3d 339, 343 (9th Cir.

6  1996).  The court must approve an EIS if it "fostered informed

7  decision-making and public participation." *Nat'l Parks & Conservation*

8  *Ass'n v. U.S. Dep't of Transp.*, 222 F.3d 677, 680 (9th Cir. 2000).

9  The court's task is to ensure that the agency has taken a "hard look"

10 at probable environmental consequences.  Hells Canyon Alliance v. U.S.

11 Forest Service, 227 F.3d 1170, 1177 (9th Cir. 2000).   The reviewing

12 court is to make a pragmatic judgment without substituting its

13 judgment for that of the agency concerning the wisdom or prudence of a

14 proposed action.  California v. Block, 610 F.2d 953, 961 (9th Cir.

15 1982).

16     Challenges to final agency actions taken pursuant to NEPA are

17 subject to the review provisions of the Administrative Procedure Act

18 (APA).  Southwest Center for Biological Diversity v. Bureau of

19 Reclamation, 143 F.3d 515, 522 (9th Cir. 1998).  5 U.S.C. §702

20 provides that "[a] person suffering legal wrong because of agency

21 action, or adversely affected or aggrieved by agency action within the

22 meaning of a relevant statute, is entitled to judicial review

23 thereof."  Pursuant to 5 U.S.C. §706(2)(A), a reviewing court shall

24 "hold unlawful and set aside agency action, findings and conclusions

25 found to be arbitrary, capricious, an abuse of discretion, or

26 otherwise not in accordance with the law."  For example, an agency's

determination of the environmental significance of new information should stand unless it is found to be arbitrary and capricious. Marsh, 490 U.S. at 377.  Pursuant to 5 U.S.C. §706(2)(D), a reviewing court shall also "hold unlawful and set aside agency action, findings and conclusions found to be without observance of procedure required by law."  Disputes which are primarily legal in nature are reviewed under a "reasonableness" standard.  Alaska Wilderness Recreation & Tourism v. Morrison, 67 F.3d 723, 727 (9th Cir. 1995).

     1.  Scott Marking Guidelines

     Plaintiffs assert that the Project violates NEPA because USFS refused to disclose and respond to the Scott Mortality Guidelines controversy.  Defendants, on the other hand, respond that the EIS thoroughly discusses Plaintiffs' criticisms of the Scott Guidelines, therefore complying with the NEPA requirement to acknowledge contrary scientific views.  Defendants point out that in the face of contrary scientific views, USFS is entitled to rely on the views of their own experts.  The declaration of USFS professional forester Richard M. Schaefer III is offered to supports USFS's conclusion that the timber sales were narrowly tailored to focus on the most severely burned and predominantly dead forest stands in the project area.  In summary, USFS argues that the EIS demonstrates the Scott Guidelines are amply supported by the scientific literature and the USFS' reliance was reasonable.

     Plaintiffs specifically argue that the Scott Guidelines are flawed in that these guidelines greatly overstate the rate of tree death following fire.  Ct. Rec. 46, at 20.  Plaintiffs suggest,

ORDER ~ 16

1  through their expert Dr. Edwin Royce, that the Ryan and Reinhardt

2  model is better suited and more reliable for the evaluation of the

3  probability of mortality for the trees at issue in the Project site.

4  First Royce Decl., ¶17.

5      Defendants additionally note that Plaintiffs' reliance on Dr.

6  Royce's survey and conclusion that "64% of trees designated for

7  harvest had a good probability for survival" is fatally flawed because

8  he assumed that all trees marked had been marked according to Scott

9  Guidelines, when a majority of trees (for the 3 sales at issue) had in

10 fact been marked under the "Danger tree marking system."

11     Courts must defer to the Agency's determination of the

12 appropriate scientific methodology.  See *Hell's Canyon Alliance v.*

13 *USFS,* 227 F.3d 1170, 1177 (9th Cir. 2000).  Contrary to Plaintiffs'

14 position, however, at the present time there are not sufficient

15 technical documents before the Court that support Plaintiffs'

16 assertion that use of the Scott Guidelines by USFS was arbitrary and

17 capricious.  Since substantial deference is given to the USFS's

18 decision to resolve scientific disputes as it sees fit and because

19 scientific evidence does not indicate the Scott Guidelines are fatally

20 flawed, the Court is not likely to find the USFS's use of this model

21 to be improper.  *Friends of Endangered Species, Inc. v. Jantzen*, 760

22 F.2d 976, 986 (9th Cir.1985).

23     Although the Plaintiffs' attack on the scientific underpinnings

24 of the EIS, and in particular the use of the Scott's Guidelines,

25 raises reasonable questions, the agency's methodology does not fail

26 the "rule of reason." *Association of Public Customers v. Bonneville*

*Power Admin*., 126 F.3d 1158, 1188 (9th Cir.1997).  It is implicit throughout the EIS that the USFS relied heavily on its own expertise both in developing the method of analysis outlined above and in conducting that analysis.   The agency is entitled to rely on its own expertise. *See generally Marsh*, 490 U.S. at 378, 109 S.Ct. 1851 ("an agency must have discretion to rely on the reasonable opinion of its own qualified experts" where specialists express conflicting views). The USFS's analysis of the tree mortality in the sales cutting areas using a tool (Scott Guidelines) developed for predicting relative probability of survival of Conifers in the Blue and Wallowa Mountains[3] but that has not to the Court's knowledge, as the Plaintiffs points out, been validated specifically in the Douglas-fir and Ponderosa pine tree context-is a decision well within the realm of its expertise.

It is not a violation of NEPA for the EIS to rely on particular scientific methodologies and studies instead of others.   *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 986 (9th Cir.1985); see also, 40 C.F.R. § 1502.24.  The agency's choice of studies on which to rely is within its discretion, and courts are precluded from reviewing such decisions unless they are found to be arbitrary or capricious. 5 U.S.C. § 706(2)(A).  While the Scott Guidelines are the subject of critical comment, the Court cannot say as a matter of law that the agency's decision to rely, in part, on the guidelines is against all reason or, in other words, arbitrary and capricious. Consequently, this Court will defer to the USFS's scientific

---

[3]See EIS, B-2.

ORDER ~ 18

1  methodology used until there is sufficient and reliable research to

2  discredit the methodology so used.

3          2.    Entry Into Roadless Areas

4          Plaintiffs argue that the USFS failed to analyze and disclose

5  potential environmental impacts this Project poses to roadless areas.

6  Plaintiffs states that logging is proposed in two significant roadless

7  areas (West Tucannon and Upper Cummins Creek)greater than 1000 acres

8  in size that are critically important to fish and wildlife. Further

9  Plaintiffs assert, the best scientific evidence establishes the

10 critical importance of roadless areas for survival and recovery of

11 salmon, steelhead, and bulltrout (i.e., roadless areas of 1000 acres

12 or larger are significant) regardless  of whether the roadless areas

13 are classified as inventoried or uninventoried.   Plaintiffs complain

14 that the USFS limited its analysis to roadless areas of 5,000 acres

15 which is arbitrary and in conflict with Ninth Circuit case law, and in

16 particular *Sierra Club v. Austin*, 82 Fed.Appx. 570, 573 (9th Cir.

17 2003).

18         Defendants respond that USFS has discretion to define the scope

19 of its project.   The West Tucannon and Upper Cummings Creek areas are

20 not inventoried roadless areas (IRAs) as designated by the Forest

21 Service and are less than 5,000 acres in size.   Defendants point out

22 that only two IRAs lie in or adjacent to the boundaries of the School

23 Fire: Willow Springs and Meadow Creek IRAs.   Thus, no basis for the

24 type of analysis Plaintiffs assert was required under NEPA.

25         Defendants further respond that Plaintiffs reliance on the

26 statements of the U.S. Fish and Wildlife Service, National Marine

Fisheries Service, and the Eastside Forests Scientific Society Panel made in the 1990s regarding unroaded areas greater than 1,000 acres to argue that the West Tucannon and Upper Cummings Creek areas must specifically be considered in the EIS is misplaced.  These Biological Opinion statements were concerned with a specific species-bull trout and Snake River Salmon-not with inventoried roadless areas.  These statements, Defendants argue, have no bearing on whether unroaded areas greater than 1,000 acres are to be addressed in any particular manner under NEPA.  Finally, Defendants point out, the regulations that now govern IRAs, 36 C.F.R. §294 subpart B (2005), do not contain specific direction requiring separate analysis of unroaded areas.

Although the analysis was very general, the Court finds that the EIS adequately analyzed effects of the Project on the West Tucannon and Upper Cummings Creek areas to satisfy NEPA, although it did not separately discuss these two areas, but rather stated that "there are no large blocks of land where the undeveloped character of the area meets the minimum criteria of 5,000 acres or greater that might make them potentially designated as an IRA or wilderness area."  EIS, at 3-270.  It appears the EIS examined the environmental effects of the Project on the identified "IRA-equivalents" and areas of undeveloped character although in a very basic sense.  EIS, at 3-270-71.

Because, as Defendants point out, no activities would occur in IRAs as part to the Project except for felling of dangerous trees along roads, the EIS concluded that there would be no effect on the roadless character of IRAs.  The EIS concluded that the Project would have short-term effects on natural integrity and opportunity for

solitude and primitive experience in areas of undeveloped character,
which would fade over time.  The EIS also concluded that no
irreversible or irretrievable effects were anticipated from any of the
alternatives.

Through the EIS, the USFS has articulated a reasonably thorough
discussion of the significant aspects of the probable environmental
consequences that will occur in the unroaded areas, which is all that
is required under Ninth Circuit review.  *See Oregon Natural Resources
Council v. Lowe*, 109 F.3d 521, 526 (9th Cir. 1997).[4]

Additionally, Plaintiffs complain that the USFS did not address
the impact on endangered species of salmon and steelhead as well as
other species in the EIS.  The Court finds that while the USFS could
have provided additional information in this regard, the EIS does
discuss the possible impact to fish species, and other sensitive,
endangered and threatened species.  EIS, Chapter 3.

Finally, Plaintiffs state the logging proposal in roadless areas
of the Project threatens irreparable harm and will permanently deplete
a range of goods and services that the public may enjoy in the future.
Ct. Rec. 46 at 3.  Plaintiffs retained economic expert Ernest Niemi to
assess the range of harms and benefits from the Project.  The Court

_____

[4]In reviewing the adequacy of an EIS, "[t]his circuit employs a
'rule of reason' that asks whether an EIS contains a 'reasonably thorough
discussion of the significant aspects of the probable environmental
consequences.' " *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1519
(9th Cir.1992) (citations omitted).

ORDER ~ 21

has reviewed the declaration of Mr. Niemi, who agrees with Plaintiffs'
position, and alleges that the logging may not be economical to the
USFS unless the USFS considers reasonable alternatives and finds ways
to minimize collateral harm.  Id. at 5.  The declaration reflects the
crux of Plaintiffs' complaint-they disagree with the USFS's decision.
Mr. Niemi's opinion does not focus the Court's attention on the three
sales before the Court and its evidentiary reliability is compromised
in the context of a request for extraordinary relief due to its
speculative nature.  The Court's job is not to question the wisdom of
the USFS's ultimate decision or its conclusion concerning the
magnitude of economic impacts.  The evidence examined as a whole,
suggests the Forest Service made a reasonable, good faith, objective
presentation of those impacts sufficient to foster public
participation and informed decision making.

The reviewing court must make a pragmatic judgment whether the
EIS's form, content and preparation foster both informed decision
making and informed public participation.  *Environmental Council v.
Kunzman*, 817 F.2d 484, 492 (9th Cir.1987).  The reviewing court may
not "fly speck" an EIS and hold it insufficient on the basis of
inconsequential, technical deficiencies. Id.  However, an EIS may be
found inadequate under NEPA if it does not reasonably set forth
sufficient information to enable the decision maker to consider the
environmental factors and make a reasoned decision. Id.  Although the
USFS could have made its discussion of impact on roadless areas more

thorough, given the time constraints,[5] the Court believes its treatment

of this issue was sufficient to satisfy the requirements of NEPA.

          3.    Consideration of the "No Action" Alternative or
                  Reasonable Range of Alternatives

      Finally, the Court also rejects the claim that the USFS violated

NEPA by failing to include a reasonable range of alternatives. The EIS

considered three alternatives: (1) the no action alternative; (2) the

proposed action; and (3) an alternative that would harvest 4,188 acres

of predominantly dead trees (according to the USFS).  Additionally the

USFS considered another twelve alternatives, but eliminated these

alternatives from further study for a variety of reasons.  Ct. Rec.

34, at 25; EIS at 2-27 to 2-28.  The USFS rejected Plaintiffs

alternative preference, to exclude logging in unroaded areas such as

the West Tucannon and Upper Cummins Creek areas, as inconsistent with

the purpose and need of the Project.  EIS at 2-27.  Further,

Defendants indicate that in rejecting Plaintiffs' alternative

preference, the USFS noted that all salvage harvest in the Project is

consistent with the UNF Land and Resource Management Plan ("LRMP")

management allocations, and that the LRMP considered and anticipated

---

     [5]The Declaration of Dean Millet, Project Leader for the School Fire

Salvage Recovery Project, indicates that delay beyond one year would

result in a potential loss of 12 Million Board Feet resulting in a

potential loss of $1,547,000 to the Federal Government.  Current loss

rates have apparently increased dramatically in the past two months as

well according to Mr. Millett.  Ct. Rec. 39 at 2.

1  that such harvest following wildfire would occur, consistent with

2  guidelines and standards to protect the environment.  Ct. Rec. 34, at

3  25.

4      The USFS had a duty to "[s]tudy, develop, and describe

5  appropriate alternatives to recommended courses of action," 42 U.S.C.

6  § 4332(E), to "[u]se the NEPA process to identify and assess the

7  reasonable alternatives to proposed actions that will avoid or

8  minimize adverse effects of these actions upon the quality of the

9  human environment," 40 C.F.R. § 1500.2(e), and to "[r]igorously

10 explore and objectively evaluate all reasonable alternatives." 40

11 C.F.R. § 1502.14(a).

12     An agency is required to examine only those alternatives

13 necessary to permit a reasoned choice. *Save Lake Washington v. Frank*,

14 641 F.2d 1330, 1334 (9th Cir.1981). "The 'rule of reason' guides both

15 the choice of alternatives as well as the extent to which the

16 Environmental Impact Statement must discuss each alternative." *City of*

17 *Carmel-By-The-Sea v. United States Dep't of Transp.*, 123 F.3d 1142,

18 1154-55 (9th Cir.1997). Under the facts of this case, the Court

19 concludes that the EIS was not deficient for failing to provide more

20 variations and alternatives to Alternative B.  Plaintiffs failed to

21 demonstrate that the true "no action" alternative, or the requested

22 alternative prohibiting logging in roadless areas is a viable

23 alternative that the USFS was required by law to adopt or to evaluate

24 to a greater extent than it did.  *See City of Carmel-By-The-Sea*, 123

25 F.3d at 1154-55 ("The Environmental Impact Statement need not consider

26

1  an infinite range of alternatives, only reasonable or feasible

2  ones.").

3      Given the limited number but varied range of alternatives

4  considered by the agency, the undersigned cannot say that this

5  violated the rule of reason. See *Northwest Env'l Defense Ctr. v.*

6  *Bonneville Power Admin*., 117 F.3d 1520, 1538 (9th Cir.1997) ("We

7  review an agency's range of alternatives under a 'rule of reason'

8  standard that 'requires an agency to set forth only those alternatives

9  necessary to permit a reasoned choice.' ") (citation omitted).

10      C.   NFMA Violations

11      The USFS manages the Forest, and is required by statute and

12  regulation to safeguard the continued viability of wildlife in the

13  Forest.  *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957,

14  961 (9th Cir. 2002).  In carrying out its management responsibilities,

15  the Forest Service must comply with the mandates of the Forest Act, 16

16  U.S.C. §§ 1600-1687.   The Forest Act requires the Forest Service to

17  develop a land and resource management plan for each forest that it

18  manages. 16 U.S.C. § 1604.

19      Forest planning occurs at two levels: the forest level and the

20  individual project level. See generally, 36 C.F.R. Pt. 219 (2005); *see*

21  *also Ohio Forestry Ass'n v. Sierra Club*,523 U.S. 726, 729-30 (1998).

22  At the forest level, the Forest Service develops a Land and Resource

23  Management Plan ("LRMP") or Forest Plan, which is a broad, long-term

24  planning document for an entire National Forest. LRMPs establish

25  planning goals and objectives for units of the National Forest System

26  and provide specific standards and guidelines for management of forest

resources, ensuring consideration of both economic and environmental factors. 16 U.S.C. § 1604(g)(1)-(3).  At the project level, site-specific projects are proposed that are consistent with a LRMP. *See Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1511-12 (9th Cir. 1992). Each project may proceed only if it is consistent with the LRMP, has been analyzed as may be necessary pursuant to NEPA, and has been specifically approved by the responsible Forest Service official. See generally 16 U.S.C. § 1604(i); *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 757(9th Cir. 1996).

### 1.  Eastside Screens

The Eastside Screens, as explained by Plaintiffs, include three separate screens: a riparian, ecosystem and wildlife screens.  Ct. Rec. 3 at 17.  "Salvage sales," are not subject to the ecosystem screen but such sales are required to comply with the riparian and wildlife screens.  Id. at 18.  According to Plaintiffs, the Eastside Screens remain in place for the forests in the UNF.  Id.  Plaintiff further explains that if a tree is alive and greater than or equal to 21 inches in diameter, it must be protected from logging.  Id. at 19.

At the hearing Defendants agreed with Plaintiffs regarding the "21 inch rule" but informed of the exemptions to the Eastside Screens as set forth in Appendix C of the EIS.  The USFS maintains it complied with the Eastside Screens.

Plaintiffs contend that the Project violates the "Forest Plan" pursuant to NFMA.  Plaintiffs explain that all site-specific projects and activities on national forests must be consistent with the applicable Forest Plan, which has specific standards for live tree

ORDER ~ 26

retention.  According to Plaintiffs, USFS violates NMFA by allegedly ignoring the Eastside Screens, the focus of which is to preserve green, live trees that exist today in order to retain the option of protecting these trees in the near future.  By logging trees that are alive, healthy and over 21 inches, Plaintiffs assert USFS violates the Eastside Screens.

Plaintiffs expert Dr. Royce, states that substantial numbers of live, green trees over 21 inches have been marked to cut.  See First Decl. of Dr. Royce, ¶26.  Plaintiffs complain that the USFS "stubbornly refused to reassess the status of the large trees marked for harvest, along with its earlier predictions that these trees would die, despite the evidence Plaintiffs have put forward."  Ct. Rec. 3 at 23.  This alleged refusal to reassess the status of the large trees is arbitrary and capricious argues Plaintiffs.  Id.

Although the declarations of Dr. Royce indicate that he used a "systematic site selection protocol in the field work" the Court cannot discern if he was surveying the proper sites for the three sales at issue.  For instance, Dr. Royce states that the map obtained by the Plaintiff and its two volunteers Nathan Griffin and Shawn Malone from the Pomeroy District Office, "did not contain any information as to exactly where within those perimeters the logging is slated to occur."  Second Royce Decl. at ¶9.

It is difficult for the Court to tell if Plaintiffs' survey areas overlap with the USFS's survey areas for the subject sales.  Further, Plaintiffs ask the Court to accept the data collected through the systematic site selection protocol used by Dr. Royce to be

ORDER ~ 27

"representative of the entire project area."  First Royce Decl., ¶82.
Plaintiffs fail to provide a clear showing to meets its burden for the
extraordinary relief sought.  See *City of Angoon v. Marsh*, 749 F.2d
1413, 1415 (9th Cir. 1984).  The requested relief cannot be granted
based on data Plaintiffs ask the Court to infer from sampling from
somewhere within the entire Project area, rather than specifically
from the cutting areas for the three subject sales.

**VI.  Plaintiffs' Motion to Strike**

        Plaintiffs request the Court to strike the Second Declaration of
Dean Millett, which declaration was filed on September 1, 2006 and
after the August 30th hearing.  Plaintiffs argue that it contains new
information that has not been previously disclosed to the public.
Plaintiffs state that Mr. Millett's declaration includes extra-record
information that has not been provided to Plaintiffs prior to the
filing of the subject declaration.  In the alternative, Plaintiffs
request the Court to be permitted to respond to the Second Dean
Millett Declaration with a Third Declaration of Edwin Royce and submit
additional briefing.

        Defendants respond that Plaintiffs' motion to strike is without
merit.  Specifically, Defendants argue that the Agency is allowed to
submit documents explaining the administrative record, particularly in
the context of a motion for temporary restraining order and
preliminary injunction where there is insufficient time to produce the
administrative record.  Ct. Rec. 60 at 2 (citations omitted).
Defendants state that they did not have sufficient time to prepare the
extensive administrative record for the Project when they responded to

Plaintiffs' motion for emergency injunctive relief.  Defendants further argue that the Second Millett Declaration can be considered by the Court because it is explanatory in nature.  The Second Millett declaration, Defendants state, can assist the Court in balancing the harms because it describes the existence of past harvest in the West Tucannon and Upper Cummings Creek areas.  The Second Millett declaration was offered to rebut the inaccurate statement made by Plaintiffs at the oral hearing for the first time that there had been no prior timber harvest in the West Tucannon and Upper Cummings Creek areas.    Finally, Defendants urge the Court to disregard the Third Declaration of Dr. Royce offered as an alternative to the motion to strike because Dr. Royce is not qualified under the Federal Rules of Evidence to opine on the potential impacts the Milly, Oli and Sun sales may have on erosion.  According to Dr. Royce, his expertise lies in the fields of applied physics and botany, with a specialization in forest plant ecology.  He does not profess to have expertise in the areas of hydrology or soils. Ct. Rec. 60 at 7.

The Court finds Defendants' arguments convincing.  The Second Declaration of Millett will not be stricken.  Further, the Court finds that, although Dr. Royce's Third Declaration appears to opine beyond his area of expertise, the declaration will be considered for admissible content only.

**VII.  Conclusion**

The EIS contains a reasonably thorough discussion regarding the amount of timber that is dead, dying or expected to die in the Project area and the effect that its removal, plus the removal of green trees,

will have on the environment.  The timber sales Plaintiffs seek to enjoin were narrowly tailored to focus on the most severely burned and predominantly dead forest stands in the Project area.  See Schaefer Decl.  Mr. Schaefer spent three months marking the dead trees burned by the School Fire.  Id. at ¶4.  In contrast, Intervenors argued at the hearing, Plaintiffs' expert Dr. Royce spent "a few days" marking trees from a map that purportedly did not contain any information as to exactly where within those perimeters the logging was slated to occur.

Review of the EIS indicates that the Project appears to be consistent with the LRMP, has been analyzed pursuant to NEPA, and has been specifically approved by the responsible Forest Service official. The USFS took the requisite "hard look" at the environmental impacts of the Project on the various values of the UNF. The agency devoted 276 pages of the EIS to exploring the possible environmental consequences of three alternatives on various values of the UNF.  Although one may disagree with its conclusions, the Court cannot conclude that the agency failed in its duty to take the requisite "hard look."

**IT IS ORDERED**:

1.  Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, Ct. Rec. 2, filed August 16, 2006 is **DENIED**.

2.  American Forest Resource Council, Boise Building Solutions Manufacturing, LLC, and Dodge Logging, Inc.'s Motions to Expedite, Ct. Recs. 21, 31, filed August 24, 2006 are **GRANTED**.

ORDER ~ 30

3.    American Forest Resource Council, Boise Building Solutions Manufacturing, LLC, and Dodge Logging, Inc.'s Motion to Intervene, Ct. Rec. 22, filed August 24, 2006, is **GRANTED**.

4.    Motion to Appear Pro Hac Vice re Attorney: Scott Horngren, Ct. Rec. 19, filed August 24, 2006,is **GRANTED**.

5.    Plaintiffs' Motion to Strike Second Declaration of Dean Millett, or in the Alternative, Permission to Submit Third Declaration of Dr. Edwin B. Royce and Additional Briefing, Ct. Rec. 58, filed September 6, 2006, is **DENIED in part** and **GRANTED in part**.  The Second Declaration of Dean Millett will be considered.  The Third Declaration of Edwin Royce will be considered to the extent such evidence is admissible.

**IT IS SO ORDERED.**  The District Court Executive is directed to enter this Order and provide copies to counsel.

**DATED** this 11th day of September, 2006.

*s/Lonny R. Suko*
_____
LONNY R. SUKO
United States District Judge

ORDER ~ 31