UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

THE LANDS COUNCIL, a
Washington nonprofit
corporation, HELLS CANYON
PRESERVATION COUNCIL, an
Oregon nonprofit corporation,
OREGON NATURAL RESOURCES
COUNCIL, an Oregon nonprofit
corporation, and SIERRA CLUB,
a California nonprofit
corporation,

                 Plaintiffs,

          v.

KEVIN MARTIN, Forest
Supervisor of the Umatilla
National Forest, and the
UNITED STATES FOREST SERVICE,
an agency of the United
States Department of
Agriculture,

                 Defendants,

          and

AMERICAN FOREST RESOURCE
COUNCIL, an Oregon
corporation; BOISE BUILDING
SOLUTIONS MANUFACTURING, LLC,
a Washington limited
liability company; and Dodge
Logging, Inc., an Oregon
corporation,

                 Defendant-Intervenors.

NO. CV-06-0229-LRS

ORDER DENYING PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT
AND GRANTING DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

ORDER ~ 1

**I.  Procedural and Factual Background**

This action involves challenges against Forest Supervisor Kevin Martin and the United States Forest Service ("Forest Service") under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., and the National Forest Management Act ("NFMA"), 16 U.S.C. § 1604 et seq.

In August 2005, the School Fire burned approximately 51,000 acres, about 28,000 acres of which were on the Umatilla National Forest ("UNF"). Li Decl., Exh. B at 1-2.  The School Fire was characterized as a mosaic burn pattern, leaving areas untouched adjacent to the burned areas according to the Plaintiffs.  Plaintiffs argue that many trees showed little, if any, sign of scorch or burn. Defendants assert that about 15,380 acres of the total burned National Forest lands may have experienced direct or immediate consequences of fire-caused injury severe enough to kill 75% or more of the trees. EIS at 1-3.

The entire School Fire Project – instituted in response to the School Fire – area consists of an estimated 9,432 acres of burned woodland located in the UNF and involves the salvage harvest of dead and dying trees and any trees that present a danger to public safety. EIS at 1-6.

Development of the Project began in the fall of 2005.  Ct. Rec. 34, at 2.  On October 26, 2005, the Forest Service published a Notice of Intent to prepare an Environmental Impact Statement ("EIS"), 70 Fed. Reg. 61783 (Oct. 26, 2005).   The Forest Service also provided informational packets to 230 individuals and organizations, soliciting

comments from the public on the proposal.  EIS at 2-2.  The Forest
Service received and reviewed 24 scoping comments.  EIS at 2-4.  On
April 20, 2006, the Forest Service released a draft EIS on the
Project, including all of the Plaintiffs. EIS at 2-3.  USFS received
and responded to 22 of the comments on the Draft EIS for the Project.
EIS at 2-4.

On July 10, 2006 the Forest Service completed and released a
Final EIS analyzing the potential environmental impacts of the
proposed Project.  Ct. Rec. 34, at 3.  A final environmental impact
statement ("FEIS") for School Fire Salvage Recovery Project was issued
July 26, 2006.

On July 31, 2006, the Forest Service Chief signed the first
Emergency Situation Determination ("First ESD") under 36 C.F.R. §
215.10(b) for the Milly, Oli and Sun sales that lie in 3,674 acres of
the most severely burned areas of the Project.  This determination was
based on substantial loss in economic value of dead and dying timber
if implementation of that portion of the Project were delayed during
the administrative appeals process until November 2006.  Li Decl.,
Exh. G.  Such a delay, according to Project Leader Dean Millett, would
result in a potential loss in value to the federal government of
$1,547,000.  Millett Decl., §3.

A record of decision ("ROD") signed August 14, 2006 authorized
9,430 acres of salvage harvest.  Also in August, and pursuant to the
First ESD, the three timber sales referenced above (Milly, Oli, and
Sun) were awarded covering about 3,670 acres with an estimated volume
of 28 million board feet ("MMBF").  The First ESD expedited logging,

without the stay associated with the regular administrative appeal process.

The Forest Service provided (4) reasons as the "Purpose and Need" for the School Fire Project:

1) recover "some economic value" for the community from the burned timber;
2) provide for timber harvest to help meet demand for wood products;
3) provide for a safe road trail system; and
4) provide for the production of wood products "consistent with various resource objectives and environmental constraints."

The EIS for the Project consisted of (3) alternatives:

1) Alternative A: No action

2) Alternative B: Log 9,432 acres

3) Alternative C: Log 4,188 acres.

The Forest Service selected Alternative B. The EIS indicated that reforestation by hand planting would occur on the harvested acres that are outside danger tree areas. Id.

Plaintiffs, four conservation groups, filed this suit in the district court on August 15, 2006 after exhausting administrative remedies. Plaintiffs alleged the Forest Service failed to adequately analyze impacts to certain undeveloped areas, failed to consider a reasonable range of alternatives, failed to comply with the Eastside Screens to protect old-growth trees, failed to adequately consider the scientific controversy regarding "Factors Affecting Survival of Fire-Injured Trees" (Scott et al. 2002, 2006), and failed to adequately analyze cumulative environmental impacts. Timber sale purchasers, Boise Building Solutions Manufacturing, LLC, and Dodge Logging, Inc.;

American Forest Resource Council, Boise Building Solutions Manufacturing, LLC, and Dodge Logging, Inc., along with American Forest Resource Council ("Intervenors") joined in the lawsuit as Defendant-Intervenors.

On August 18, 2006, the parties reached a stipulation regarding a briefing schedule that allowed the matter to be heard by the Court prior to ground disturbing activities.  The Forest Service agreed to stay all on-the-ground implementation of the Milly, Oli, and Sun Salvage Sales until September 2, 2006.

On August 30, 2006, the Court heard oral argument on Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (Ct. Rec. 2), filed on August 16, 2006, and denied the motion on September 11, 2006 (Ct. Rec. 63), finding that the Forest Service had not failed in its duty to take the requisite "hard look" at the environmental consequences.  At the hearing on August 30, 2006, the parties reached another stipulation to stay all on-the-ground implementation of the Milly, Oli, and Sun Salvage Sales until September 12, 2006, while the Court took the case under advisement.  Plaintiffs immediately appealed the decision to the Ninth Circuit Court of Appeals ("Court of Appeals").  On September 15, 2006, this Court denied Plaintiffs' request for stay and on September 18, 2006, the Court of Appeals denied Plaintiffs' request for an injunction pending appeal. Thereafter, the three awarded salvage timber sales began operations.

On February 5, 2007, the Court of Appeals heard oral argument on this Court's denial of the preliminary injunction.  On February 12, 2007, the Court of Appeals issued a mandate and opinion regarding the

1  appeal of the District Court's denial of a preliminary injunction as

2  to the first round of sales for the School Fire Salvage Recovery

3  Project.  *Lands Council v. Martin,* 479 F.3d 636 (9th Cir. 2007).  The

4  Court of Appeals found that the Forest Service had adequately

5  disclosed the impacts to the unroaded areas, but that the Forest

6  Service violated the Forest Plan (Eastside Screens) prohibition of

7  cutting "live trees" ≥ 21 inches diameter at breast height ("dbh")

8  when it designated dying trees for harvest.  The intent of the

9  Eastside Screens interim management direction was to restrict timber

10  harvest in those areas that scientific analysis indicated were

11  important to certain fish, wildlife, and ecosystem structure.

12      The Appeals Court reasoned that in the absence of an adopted

13  technical definition of "live trees," the common understanding of the

14  word "live" from the Merriam Webster's Collegiate Dictionary (10th ed.

15  1993) meant "to be alive," which meant "not dead," and concluded "the

16  common meaning of the term 'all live trees' is all trees that have not

17  yet died."  Opinion at 12. [cite] Thus, according to the Appeals

18  Court, dying trees designated for harvest were not yet dead, and

19  remained "live" for the purposes of the Eastside Screens.  The Appeals

20  Court further opined that "[t]he Forest Service is free, of course, to

21  amend the Eastside Screens to allow logging of old-growth dying trees,

22  either by adding a definition of the term 'live trees' or by changing

23  the requirements to maintain all live trees of certain size." *Lands*

24  *Council v. Martin*, 479 F.3d 636, 643 (9th Cir. 2007).

25      The Appeals Court remanded the case to this Court with

26  instructions "to grant immediately a preliminary injunction to

ORDER ~ 6

prohibit the logging of any 'live tree' 21" diameter at breast height that currently exists in the sales areas-i.e., any tree of the requisite size that is not yet dead." *Id*. at 643.

On February 14, 2007 this Court entered an order granting, in part, with respect to the NFMA claim, Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction.  The order enjoined Defendant Forest Service from harvesting any "live tree," 21 inches in diameter at breast height, located in the three timber sales areas (Oli, Sun and Milly).  The Forest Service, however, believed that the Appeals Court definition of a "live tree" did not reflect its silvicultural[1] practice and interpretation.  Further, the Forest Service believed such a definition deterred it from achieving the purpose and need of the School Fire Project. Thus, the Forest Service decided to amend the Umatilla National Forest's Land and Resource Management Plan ("Forest Plan" and prepared a draft supplemental environmental impact statement ("DSEIS").  The DSEIS was listed in the Federal Register on March 9, 2007 (Vol. 72 No. 46 Page 10749) for a 45-day comment period.  The supplemental statement provided documentation of a Forest Plan amendment to modify Eastside Screens' wildlife standards at 6d.(2)(a) to define both live and dead trees in support of the School Fire Project FEIS and ROD signed August 14, 2006.  The final supplemental EIS ("FSEIS") and the June 11, 2007 ROD and Finding of Non-Significant Amendment reference the 2006 FEIS and

---

[1]The cultivation of forest trees; forestry.  Webster's Encyclopedic Unabridged Dictionary, Deluxe ed., 2001, p. 1782.

ORDER ~ 7

1 ROD and that the two environmental impact statements are treated as if

2 one statement.

3      The decision to be made with the 2007 ROD was whether or not the

4 Forest Supervisor should amend the Forest Plan and modify the Eastside

5 Screens' wildlife standard at 6d.(2)(a) to define both live and dead

6 trees only for the site-specific School Fire Project.  The 2007 ROD so

7 amended the standard, adding narrative wording, to the standard as

8 follows:

> Maintain all remnant late and old seral and/or
> structural live trees  21" dbh that currently
> exist within stands proposed for harvest
> activities.  Live trees is defined as trees rated
> to have a high probability of surviving the
> effects of fire, and trees rated to have a
> moderate probability of survival where sampling
> indicates that at least 50 percent of their basal
> cambium is alive.  Dead trees are defined as trees
> rated to have a low probability of survival where
> sampling indicates that more than 50 percent of
> their basal cambium is dead.  Survival probability
> is determined using "Factors Affecting Survival of
> Fire injured Trees: A Rating System for
> Determining Relative probability of Survival of
> Confers in the Blue and Wallowa Mountains" (Scott
> et al. 2002, as amended) (commonly referred to as
> the Scott Guidelines).

19 The 2007 ROD also found that the amendment to the Forest Plan was

20 "non-significant" under the Forest Service Land and Resource

21 Management Planning Handbook ("Forest Service Handbook").

22      On June 11, 2007, Forest Service Chief Gail Kimbell found that an

23 emergency situation existed as defined in 36 CFR 215.2, which

24 eliminated the automatic stays built into the appeal review process.

25 Chief Kimbell granted an emergency exemption from stay for the

26 remaining portions of Oli and Sun salvage timber sales as well as

ORDER ~ 8

Chicken Bone and Ricochet salvage timber sales.  The Milly sale was considered completed and was not considered for the ESD request. Chief Kimbell determined that failure to act quickly would result in substantial economic loss to the Federal Government.  Implementation of the School Fire Project, determined to be an emergency, could have proceeded immediately pursuant to 36 CFR 215.10, however, the Court Order of June 27, 2007 (Ct. Rec. 195) temporarily enjoined the award of sales in the Ricochet and Chicken Bone salvage sales areas until further order of the Court.

On June 12, 2007, the Court heard oral argument from the parties on the cross-summary judgment motions (Ct. Recs. 115, 138, 148).  The Court took the motions under advisement based on the FSEIS and second ROD issued on June 11, 2007.  A telephonic status conference was held on June 18, 2007 to discuss a new briefing schedule for the new developments in the case.  On June 29, 2007, Plaintiffs filed a motion for summary judgment on the FSEIS, including a request to permanently enjoin Forest Plan Amendment.  Cross-motions were filed by the Intervenors and the Forest Service, which included requests to dissolve the injunction in place.

On August 2, 2007 the Court heard oral argument for the following motions: 1) Intervenors' Motion to Dissolve Injunction Re: Forest Plan Amendment to Define Live and Dead Trees, Ct. Rec. 198, filed June 29, 2007; 2) Plaintiffs' Motion to Permanently Enjoin the Proposed Forest Plan Amendment, Ct. Rec. 200, filed June 29, 2007; and 3)Plaintiffs' Motion for Leave to File Second Amended Complaint for Declaratory and Injunctive Relief, Ct. Rec. 206, filed July 18, 2007.  Ralph Bloemers

1  appeared on behalf of Plaintiffs; Beverly Li appeared on behalf of

2  Defendant Forest Service; and Mr. Scott Horngren appeared on behalf of

3  Defendant-Intervenors.

4       After reviewing the submitted material, taking oral argument,

5  and considering relevant authority, the Court is fully informed and

6  hereby denies Plaintiffs' Summary Judgment Motion and Motion to

7  Permanently Enjoin the Forest Plan Amendment and grants Defendants

8  Motions for Summary Judgment.

9  **II.   Standard of Review**

10       Challenges to agency action are reviewed under the APA's

11  "arbitrary and capricious" standard, *Westlands Water District v. U.S.*

12  *Dept. Of Interior*, 376 F.3d 853, 865 (9th Cir. 2004), which is a

13  narrow one that precludes a reviewing court from substituting its own

14  judgment for that of the agency. *Northwest Envtl. Advocates v. NMFS*,

15  460 F.3d 1125, 1135 (9th Cir.2006).  Deference is particularly

16  appropriate where questions of scientific methodology or technical

17  expertise are involved.  *Marsh v. Oregon Natural Resources Council*,

18  490 U.S. 360, 376-77 (1989).

19       In reviewing the USFS's compliance with NEPA and NFMA, the court

20  must determine whether the agency's actions were "arbitrary and

21  capricious, an abuse of discretion, or otherwise not in accordance

22  with the law." *Or. Nat. Resources Council v. Loew*, 109 F.3d 521, 526

23  (9th Cir. 1997).  Review under such a standard is narrow and highly

24  deferential, only requiring the agency to "articulate a rational

25  connection between the facts found and the conclusions made." Id. The

26

ORDER ~ 10

Ninth Circuit requires that a challenge to a decision to not prepare an initial EIS must be reviewed under the arbitrary and capricious standard. *Greenpeace Action*, 14 F.3d at 1331. Given the narrowness of the standard of review, the Court recognizes it may not substitute its own judgment for that of the agency concerning the wisdom or prudence of a proposed action. *W. Radio Services Co., Inc. v. Glickman*, 113 F.3d 966, 970 (9th Cir. 1997).

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), Fed.R.Civ.P.; *see also, Celtex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Summary judgment is particularly applicable to cases involving judicial review of final agency action. *Occidental Engineering Co. v. INS*, 753 F.2d 766, 770 (9th Cir.1985) (citation omitted). Summary judgment is appropriate in this case because the issues presented address the legality of federal agency actions based on the administrative record and do not require resolution of factual disputes.

**III.  Cross-Motions for Summary Judgment**

Plaintiffs allege that the Forest Service failed to adequately analyze the environmental impacts of the School Fire Project. More specifically, Plaintiffs argue that two significant roadless areas will be impacted by the Project. Ct. Rec. 3, at 5. The West Tucannon roadless area is located to the West of the Willow Spring Inventoried Roadless Area ("Willow Springs IRA"). West Tucannon is separated from Willow Springs by Forest Road 47 and is close to 5,000 acres in size. The Upper Cummins Creek roadless area is immediately adjacent to the

Southeast corner of Willow Springs, a roadless area of more than 10,000 acres. Id.

Plaintiffs allege that Defendants have failed to comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321-4370, the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600-1614, the Administrative Procedures Act ("APA"), 5 U.S.C. § 501-706, and applicable implementing regulations in promulgating the Project. Plaintiffs seek injunctive relief to prevent alleged irreparable injury to old growth stands, roadless areas, soils, and habitat for salmon, steelhead, Rocky Mountain Elk and a diverse range of protected species. Ct. Rec. 3, at 3.

Plaintiffs specifically request declaratory relief and a permanent injunction prohibiting Defendants from implementing or otherwise moving forward with the School Fire logging project which permits post-wildfire logging on steep slopes, until such time as Defendants can demonstrate compliance with the NFMA and NEPA. Plaintiffs seek attorney fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. §2412 et seq.

Defendant Forest Service and Defendant-Intervenors both request this Court defer to "informed discretion of the responsible federal agencies" and find that the agency did not act arbitrarily and capriciously nor did it violate NEPA and NMFA. Defendants request that the preliminary injunction in place be lifted.

/ / /

/ / /

/ / /

ORDER ~ 12

**A.  NEPA CLAIM**

1.  **Roadless Areas**

Plaintiffs allege that the Forest Service violated NEPA by failing to analyze and disclose significant impacts that logging and roadbuilding would have on roadless areas that are critical for the survival of fish and wildlife within the School Fire Project area. Plaintiffs specifically allege that the Forest Service did not disclose the significant environmental impacts of the School Fire Project on unroaded and undeveloped areas, particularly (2) different roadless areas: the West Tucannon and Upper Cummins Creek. Additionally, Plaintiffs insist that the NEPA documents prepared by the Forest Service are inadequate because they do not address the unroaded areas of the Tucannon River Watershed.   This omission, Plaintiffs argue, is environmentally significant under the *Smith v. U.S. Forest Serv.*, 33 F.3d 1072 (9th Cir.1994 ).

Plaintiffs further allege that the Forest Service failed to consider a reasonable alternative that avoided logging roadless areas while still producing economic value through logging. By failing to disclose the environmental consequences of logging in the unroaded areas, Plaintiffs reason, the Forest Service was unable to present at least one reasonable alternative that avoided logging in roadless areas.  Its "No Action" alternative does not address Plaintiffs' concerns either.

In summary, Plaintiffs state that the Forest Service's failure to disclose and analyze impacts of logging and roadbuilding on roadless areas exceeding 1,000 acres in size was arbitrary and capricious.  It

1  was improper, Plaintiffs contend, for the Forest Service to look only

2  at roadless areas > 5,000 acres.  By doing so, Plaintiffs argue the

3  Forest Service failed to recognize that the critical importance of

4  roadless areas for the survival and recovery of listed species

5  according to the ESA, such as salmon, steelhead, and bull trout.

6  The Forest Service failed to disclose significant impact on the

7  environment of these sales altering the wilderness characteristic of

8  the West Tucannon and Upper Cummins Creek unroaded areas, precluding

9  them from wilderness designation in the future under the Wilderness

10  Act.

11      Plaintiffs request this Court to find that the Forest Service did

12  not analyze the impact on unroaded areas and that it was arbitrary and

13  capricious to limit its analysis and disclosure to areas 5,000 acres

14  and greater.  Plaintiffs request that the Forest Service be required

15  to disclose and analyze the impacts of logging on roughly 12,000 acres[2]

16  of roadless areas.

17      Defendants respond that designating new roadless areas based on

18  Plaintiffs' views would have gone well beyond the purpose and need of

19  the School Fire Project.   The Forest Service's consideration of

20  _____

21      [2]Plaintiffs arrive at the figure 12,000 acres by noting that the

22  Upper Cummins Creek URA (uninventoried roadless area) abuts the southeast

23  section of the Willow Springs IRA, and if combined, would be > 12,000

24  acres.  This amount, Plaintiffs argue, is twice the size of the unroaded

25  forest affected in *Smith* (5,000 acres) which logically makes it

26  environmental significant under the *Smith* case.

ORDER ~ 14

1  unroaded area attributes satisfies NEPA.  The Forest Service properly

2  excluded salvage from the inventoried roadless areas ("IRAs"), and

3  although Plaintiffs now want to exclude harvest from areas between

4  roads and to have those areas designated with a special protected

5  status, NEPA does not require such measures.

6      Defendant-Intervenors argue that the cases Plaintiffs cite in

7  support of their argument for protection of roadless areas are not

8  helpful because they have no discussion or assessment of the unique

9  values of areas of undeveloped character and the environmental

10  consequences.

11      In Chapter 2 of the FEIS, the notion that timber harvest could

12  affect the undeveloped character of some lands in the School Fire

13  Project was introduced. In Chapter 3 of the FEIS, the environmental

14  consequence section, the FEIS discussed the potential effects on the

15  unique values of unroaded areas, such as natural integrity,

16  opportunities for solitude and recreational experience, and the

17  appearance and attraction of undeveloped areas.  The FEIS explained

18  that harvest would alter the natural integrity of the area in the

19  short term because the skid trails to remove logs would be apparent,

20  as would stumps of the harvested trees.  EIS 3-269 to 3-271.

21  Temporary roads would also alter natural integrity in the short term,

22  although after harvest the roads would be closed and rehabilitated.

23  Id.  *See also* EIS Appendix A, Map 8 (displaying visually all roads in

24  the Project area, including new and existing temporary roads,

25  decommissioned roads and system roads).

26

The EIS also explained that opportunities for solitude would be reduced in the short term given the noise from harvest equipment, and that the visual character would also change as a result of timber harvest.  Id.  The location of where timber harvest would occur for the entire Project as well as the type of harvest system that would be used, was disclosed in the EIS. EIS Appendix A, Map 8.  In addition to these disclosures, the EIS informed the reader that the effects to other resource attributes, i.e. attributes that are not unique to undeveloped areas, would be the same as those discussed "under the specific affected resource area in other sections of this chapter." EIS 3-272.  For example, a reader particularly interested in how the Project might affect visual resources could find that information in the portion of the EIS discussing potential effects to scenery.  See EIS 3-230 to 3-244.

The EIS discussed possible environmental effects of various alternatives to fish species, including salmon, steelhead, and bull trout.  Ultimately the Biological Assessment reached a "May Affect, Not Likely to Adversely Affect" chinook salmon, steelhead, and bull trout, and it reached that conclusion based on many considerations such as" (1) Project implementation would reduce sediment delivery to streams; (2) aquatic habitat protections were going beyond those required by PACFISH; (3) Project units were outside Riparian Habitat Conservation Areas, or RHCAs; and (4) direct harvest activities would not take place in salmon, steelhead or bull trout habitat.  CD1 AR 5971.  The EIS referred the interested reader to additional information included with the Fisheries Report.  EIS 3-49   These

1   disclosures, Defendants argue, were more than sufficient under the

2   law.  NEPA is a procedural statute, not a substantive statute

3   Defendants argue, citing *Robertson*, 490 U.S. at 350, and the

4   disclosures related to fish were more than sufficient under the law.

5       Finally, the EIS did consider alternatives that would forego

6   salvage in unroaded areas.  Under the "no action" alternative, the

7   Forest Service assessed the effects of taking no action anywhere in

8   the School Fire Project.  Plaintiffs minimize the no action

9   alternative while Defendants argue that it is a legitimate alternative

10  considered within the range.  Defendants argue that the Ninth Circuit

11  has endorsed the approach limiting alternatives to meet the purposes

12  of a project.  *Laguna Greenbelt, Inc. v. U.S. Dep't of Transp.*, 42

13  F.3d 517, 523-25 (9th Cir.1994)(upholding consideration of three

14  alternatives and brief discussion of other alternatives that were

15  eliminated from more detailed analysis).

16      Although both this Court and Appeals Court held at the

17  preliminary injunction stage that Plaintiffs failed to show a

18  likelihood of success on the merits of the NEPA claim, the Appeals

19  Court directed this Court to carefully assess:  1) the qualities of

20  the roadless areas in question, and 2) the extent of analysis in the

21  EIS in determining whether the requirements of NEPA have been

22  satisfied.  Lands Council, at 640-41.  This Court earlier held at the

23  preliminary injunction stage that the FEIS adequately discussed

24  effects on the two roadless areas at issue, which are not appropriate

25  for designation as an IRA or wilderness.  After further review, it

26  remains this Court's view as discussed in detail above, that the

ORDER ~ 17

Forest Service recognized the qualities of the roadless areas in question, i.e., natural integrity, opportunities for solitude and recreational experience.  The EIS also acknowledged that certain fish (listed species on the ESA) may be affected by the Project, although the assessment was that such species were not likely to be adversely affected.

NEPA is the "national charter for protecting the environment." 40 C.F.R. §1500.1(a).  It requires all federal agencies to prepare an EIS for "major federal actions significantly affecting the quality of the human environment."  42 U.S.C. §4332(C).  NEPA is procedural in nature and does not require "that agencies achieve particular substantive environmental results."  *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371, 109 S.Ct. 1851 (1989).  Instead, it requires agencies to collect, analyze and disseminate information so that "the agency will not act on incomplete information, only to regret its decision after it is too late to correct."  *Id*.

Courts may not "fly-speck" an EIS and must employ a rule of reason.  *Swanson v. U.S. Forest Service*, 87 F.3d 339, 343 (9th Cir. 1996).  The court must approve an EIS if it "fostered informed decision-making and public participation."  *Nat'l Parks & Conservation Ass'n v. U.S. Dep't of Transp.*, 222 F.3d 677, 680 (9th Cir. 2000). The court's task is to ensure that the agency has taken a "hard look" at probable environmental consequences.  *Hells Canyon Alliance v. U.S. Forest Service*, 227 F.3d 1170, 1177 (9th Cir. 2000).  The reviewing court is to make a pragmatic judgment without substituting its judgment for that of the agency concerning the wisdom or prudence of a

1  proposed action.  *California v. Block*, 610 F.2d 953, 961 (9th Cir.
2  1982).

3       Challenges to final agency actions taken pursuant to NEPA are
4  subject to the review provisions of the Administrative Procedure Act
5  (APA).  *Southwest Center for Biological Diversity v. Bureau of*
6  *Reclamation*, 143 F.3d 515, 522 (9th Cir. 1998).  5 U.S.C. §702
7  provides that "[a] person suffering legal wrong because of agency
8  action, or adversely affected or aggrieved by agency action within the
9  meaning of a relevant statute, is entitled to judicial review
10 thereof."  Pursuant to 5 U.S.C. §706(2)(A), a reviewing court shall
11 "hold unlawful and set aside agency action, findings and conclusions
12 found to be arbitrary, capricious, an abuse of discretion, or
13 otherwise not in accordance with the law."  For example, an agency's
14 determination of the environmental significance of new information
15 should stand unless it is found to be arbitrary and capricious.
16 *Marsh*, 490 U.S. at 377.  Pursuant to 5 U.S.C. §706(2)(D), a reviewing
17 court shall also "hold unlawful and set aside agency action, findings
18 and conclusions found to be without observance of procedure required
19 by law."  Disputes which are primarily legal in nature are reviewed
20 under a "reasonableness" standard.  *Alaska Wilderness Recreation &*
21 *Tourism v. Morrison*, 67 F.3d 723, 727 (9th Cir. 1995).

22      Here, the Forest Service certainly disseminated information
23 regarding the qualities of and impact the Project could have on
24 roadless areas.  The fire burned in August 2005.  By October 2005, the
25 Forest Service announced its intent to prepare an EIS.  On July 10,
26 2006, the Forest Service completed and released a Final EIS analyzing

ORDER ~ 19

the potential environmental impacts of the proposed Project.  This time frame allowed the Forest Service roughly nine months to collect and analyze any data.  The Court concludes, considering the circumstances of this timber salvage recovery project and the time to act, the Forest Service's observance of procedure required by law was reasonable and adequate under NEPA.

The Ninth Circuit has adopted a "rule of reason" test that necessitates inquiry into whether an EIS contains a "reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1519 (9th Cir.1992).  A reviewing court must make a "pragmatic judgment whether the EIS' form, content and preparation foster both informed decision making and informed public participation." *Id. See also, California v. Block*, 690 F.2d 753, 761 (9th Cir.1982). "Once satisfied that the agency has taken this procedural and substantive 'hard look' at environmental consequences in the EIS, the court's review is at an end." *Trout Unlimited v. Morton*, 509 F.2d 1276, 1283 (9th Cir.1974).

The reviewing court is not free to impose its judgment on an agency, *Citizens for a Better Henderson v. Hodel*, 768 F.2d 1051, 1057 (9th Cir.1985), nor "fly speck" an EIS and hold it insufficient on the basis of inconsequential, technical deficiencies. *Oregon Environmental Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir.1987).  However, an EIS may be found inadequate under NEPA if it does not reasonably set forth sufficient information to enable the decision maker to consider the environmental factors and make a reasoned decision. *Id.* at 493.

1    The Forest Service's consideration of unroaded area attributes

2  satisfies NEPA.   The Forest Service excluded salvage from the IRAs.

3  Plaintiffs' request to exclude harvest from areas between roads, which

4  areas Plaintiffs suggest should be designated with a special protected

5  status, goes beyond what is required by NEPA.

6    Although one may disagree with its conclusions, under a rule of

7  reason the Court cannot conclude that the agency failed in its duty to

8  take the requisite "hard look" with respect to the allegations

9  concerning roadless areas.   NEPA does not dictate substantive

10  environmental results but only prescribes the necessary process.

11  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51, 109

12  S.Ct. 1835, 104 L.Ed.2d 351 (1989).

13      2.  **Reasonable Range of Alternatives Analysis**

14    Plaintiffs allege that in both the FEIS and FSEIS, the Forest

15  Service did not consider a reasonable range of alternatives.

16  Specifically, the Forest Service did not consider the alternatives

17  that Plaintiffs believed were the best.   The Defendants argue that

18  the Forest Service actually considered, in the FEIS and FSEIS, 12[3] and

---

20    [3]The Forest Service did consider 12 other alternatives, including

21  exclusion of logging in undeveloped areas (West Tucannon and Upper

22  Cummins Creek) but determined it was inconsistent with the purpose and

23  need of the Project, i.e. harvesting dead and dying trees before wood

24  deterioration occurred to maximize economic benefits and removal of

25  danger trees.   Ct. Rec. 34, at 25; EIS at 2-27 to 2-28.

26

9 alternatives respectively.  However, the agency eliminated all but a couple of alternatives as the others did not meet the "purpose and need" of the School Fire as stated in the FEIS and did not clarify the definition of "live trees."  Additionally, the proposed alternatives did not predict tree mortality using methodologies that considered all parts of a similar tree system found in a similar geographical area as stated in the FSEIS.

Furthermore, the Forest Service argues there is no set number of alternatives that need to be considered and case law supports consideration of a single action alternative along with a no-action alternative as was done in the FEIS and FSEIS.  *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 900 (9th Cir.2002).

As part of the NEPA process, an agency must examine alternatives to the proposed action. See 42 U.S.C. §4332(2)(E); 40 C.F.R. §1502.14. An agency is required to examine only those alternatives necessary to permit a reasoned choice. *Save Lake Washington v. Frank*, 641 F.2d 1330, 1334 (9th Cir.1981).  A project's purpose and need determines the range of alternatives to the proposed project that an agency must analyze. *Northwest Envtl. Def.Ctr. V. Bonneville Power Admin.*, 117 F.3d 1520, 1538 (9th Cir.1997).  Agencies need not discuss alternatives that would not satisfy the purpose of the proposed action. *Headwaters, Inc. V. Bureau of Land Mgmt.*, 914 F.2d 1174, 1180-81 (9th Cir.1990).

ORDER ~ 22

The Final SEIS adequately analyzed the effects of the proposed plan amendment, SEIS AR 1674-1705, and the no-action alternative, under which the School Fire Project ROD from August 2006 would be implemented as modified by this Court's preliminary injunction order, i.e., without the harvest of any live tree ≥21 inches dbh that has green needles or that is not yet dead.  SEIS AR 1666, 1673-74.  The no-action alternative was determined to result in implementation of a project that was inconsistent with Forest Service silvicultural practice and would not address the purpose and need , i.e, it would render the majority of unharvested portions of the Oli and Sun sales, as well as the second round of sales, economically unviable.

Plaintiffs failed to demonstrate that the "no action" alternative, or the requested alternative prohibiting logging in roadless areas is a viable alternative that the Forest Service was required by law to adopt or to evaluate to a greater extent than it did.  *See City of Carmel-By-The-Sea*, 123 F.3d at 1154-55 ("The Environmental Impact Statement need not consider an infinite range of alternatives, only reasonable or feasible ones.").

Under case law, statutes, and regulations, the Court finds the Forest Service considered alternatives that satisfied the "purpose and need" of the School Fire Project and in doing so, properly declined to consider in further detail Plaintiffs' proposed alternative or alternatives that did not satisfy the purpose and need of the School Fire Project.

/ / /

/ / /

ORDER ~ 23

3.    **Soil Erosion, Soil Condition**

Plaintiffs complain that the Forest Service failed to adequately disclose the context and intensity of the existing condition and the direct, indirect, and cumulative impacts of the action, particularly with respect to the significant soil erosion and soil condition resulting from the fire and post-fire logging authorized by the School Fire Project. According to Plaintiffs' expert Andrea Traeumer[4], the Forest Service violated NEPA because it only provided the public with soil erosion predictions as average annual predictions. Ms. Traeumer explains in her declaration that use of an "average annual" erosion prediction grossly underestimates erosion caused by fire when combined with the proposed logging, roadbuilding and landing construction. Plaintiffs contend that the Forest Service should have used the recommended return period predictions in their analysis in the FEIS, which would have shown erosion predictions that were 240% greater based on a 10-year return period range.

The Forest Service used the WEPP (Water Erosion Prediction Project) model in the FEIS to estimate potential soil erosion and sediment yield to evaluate wildfire effects. Plaintiffs argue that this model failed to disclose appropriate soil erosion predictions. Further, Plaintiffs state that the Forest Service failed to implement burned soil condition standards, failed to provide soil burn severity

---

[4]The Traeumer Declarations were the subject of Defendants' motion to strike based on improper expansion of the record. These declarations were then added to the record during the supplemental EIS process.

ORDER ~ 24

1  data, failed to provide existing Detrimental Soil Conditions ("DSC")

2  on activity areas within the Project area and used the pre-fire

3  condition of the forest as a baseline for DSC.  Plaintiffs allege that

4  all the alternatives proposed were therefore in error because they

5  were based on a pre-fire baseline for DSC.  The Forest Service instead

6  should have considered the effects of the fire as part of the

7  post-fire baseline, according to Plaintiffs.

8      Plaintiffs also assert, through Ms. Traeumer, that the Forest

9  Service failed to disclose or analyze detrimental burned soil

10  standards or existing detrimental burned soil conditions.  It is also

11  alleged that the Forest Service failed to comply with the Forest

12  Service Manual policy for Watershed Condition Assessment.

13      Finally, Plaintiffs suggest that the Forest Service should have

14  used the form for "Interagency BAER Soil Burn Severity & Potential

15  Watershed Response Field Data" or another alternative data collection

16  record on the School Fire Project.

17      In response, Defendants state that the Forest Service adequately

18  analyzed effects on soil erosion and detrimental soil condition.  The

19  Forest Service states that it used a reasonable methodology, the WEPP,

20  Model to estimate erosion and sediment yield.  The WEPP Model is a

21  process-based model that takes into account many factors, including

22  climate, soil, ground cover, and topographic conditions.  FEIS at 3-

23  27, I-1; AR 4101.  The Forest Service disclosed the assumptions for

24  model runs and applicability of the WEPP Model results in the FEIS.

25  FEIS at 3-26 to 3-28, I-2 to I-3.  The FEIS clearly expressed that the

26  WEPP Model results are estimates that should not be interpreted as

absolute predictions.  FEIS at 3-27, I-1.  The Forest Service points out that the FEIS and literature cited in the FEIS disclosed that there is a large margin of error in conducting erasion estimates-plus or minus 50 percent. FEIS at 3-27, I-1; AR 4105.

The Forest Service asserts that it appropriately chose to use average annual figures rather than the ten-year return period figures. The Forest Service reasons that using the figures that Plaintiffs propose would not have improved the accuracy of the erosion predictions.  The average annual figures the Forest Service used were based on data collected over the course of thirty years and reflected an average for a variety of precipitation events over time.  AR 4873-87, 4891-4932, 4936-41, 4949-96, 5205-20.  Additionally, published scientific literature regarding erosion uses average annual rates.  AR 4104-05.  In light of the arguments made, the Defendants urge the Court to defer to the Agency's reasonable choice to use annual averages in the WEPP Model.

As to soil erosion, the Forest Service states the FEIS adequately discussed direct, indirect and cumulative effects on soil erosion. FEIS at 3-26 to 3-28; 3-33; 3-36 to 3-37; 3-39 to 3-42.  The Forest Service states that the FEIS specifically disclosed the total erosion that was estimated to result from hill slopes and roads combined under the no-action alternatives and the two action alternatives.  FEIS at 3-34 (Table 3-17).

As to Plaintiffs' allegation that the Forest Service failed to comply with Forest Plan standards for DSC or Forest Service policy documents, the Forest Service urges rejection.  The Forest Service

points out that Plaintiffs did not plead a failure under NFMA in their First Amended Complaint, but if the Court were to consider Plaintiffs' assertions, there is no violation of NFMA here.  The Forest Plan's standard for DSC applies only to "management-induced effects" due to activities within the Forest Service's control.  In analyzing the DSC, which also included potential effects for construction of new landings, the Forest Service states that it was not required to account for the extent of severely burned soils from wildland fire, a naturally-occurring event.  Finally, the mitigation measures in the School Fire Project would avoid excessive detrimental soil effects and the Project involves monitoring soil disturbance during and after harvest activities.  FEIS at 2-14 to 2-21, 3-16, H-17 to H-18.

The Forest Service asserts that the FEIS adequately disclosed burn severity data using the Burned Area Emergency Response ("BAER") process ratings.  The FEIS disclosed the acres and percentage of the fire area that was a low, moderate, or high burn severity in the aggregate and by the harvest unit based on ratings from the BAER process.  FEIS at 3-12 (Table 3-4), H-24 to H-29 (Table H-6). The FEIS contains a burn severity map that depicted areas of low, moderate and high burn severity, which map reflects ground and air verification and adjustment of satellite imagery data.    FEIS, App. A, 3-23.

As clarified by the Ninth Circuit Court of Appeals in *Neighbors of Cuddy Mountain v. United States Forest Service*, 137 F.3d 1372, 1379 (9th Cir.1998), in order for the agency to "consider" cumulative effects, "some quantified or detailed information is required," since, without it, "neither the courts nor the public, in reviewing the

1  Forest Service's decisions, can be assured that the Forest Service
2  provided the hard look that it is required to provide." *Id*. General
3  statements about "possible" effects and "some risk" are generally
4  insufficient, and it is not appropriate for the agency "to defer
5  consideration of cumulative impacts to a future date." *Id*. at 1380.

6      In this case, the Court finds the decision maker considered the
7  cumulative effects of the salvage operation and concluded no
8  cumulative effects for fish, water, wildlife, soils would occur as a
9  result of the salvage logging.  FEIS at 3-11 (Table 3-3), 3-15 to 3-
10 21, H-8 to H-16 (Table H-4).  This Court finds that the Forest Service
11 did not act arbitrarily or capriciously in reaching the conclusion
12 that any impact on the soil was not significant or in violation of
13 established soil standards.  More specifically, the Court concludes
14 that the Forest Service's choice to use annual averages in the WEPP
15 Model is reasonable and finds that the Forest Service adequately
16 disclosed, analyzed, discussed the effects on both soil erosion and
17 DSC and adequately disclosed burn severity data.

18     **4. Economic Costs and Benefits**

19     Plaintiffs allege the Forest Service failed to disclose and
20 analyze the full range of economic costs and benefits of logging in
21 the FEIS before it made its decision.  Plaintiffs argue the Forest
22 Service focused exclusively on the short-term benefits for the timber
23 industry which constitutes a violation of NEPA and NWFA.

24     The Forest Service states that it adequately disclosed and
25 analyzed the full range of costs and benefits of the School Fire
26 Project.  Further, the Forest Service responds that Plaintiffs'

reliance on the 1982 Planning Rule is misplaced as the 1982 Planning Rule has been superceded by the 2000 Rule and 2005 Rule, neither of which require economic effects be analyzed at the project level in the manner Plaintiffs suggest.  Citing *Forest Service Council v. U.S. Forest Serv*., Civ.No.C02-1293C, slip op. At 21-25 (W.D. Wash. Sept. 14, 2004), the Forest Service points out that the Ninth Circuit has upheld the proposition that the 1982 regulations do not require monetization of non-timber resources for site-specific projects.  The Forest Service also argues that the *Natural Resources Defense Council v. U.S. Forest Service*, 421 F.3d 797 (9th Cir. 2005), heavily relied upon by Plaintiffs, does not stand for the proposition that non-timber resources for the School Fire Project must be monetized under NMFA or NEPA.  The Forest Service concludes that the FEIS satisfied NEPA by taking a hard look at effects on resource values, without undertaking a monetized analysis of all resources.

The Court finds that the Forest Service did take the requisite hard look at the resource values which Plaintiffs argue should be monetized.  FEIS at 3-249 to 3-253 (recreation); 3-171 to 3-221 (wildlife); 3-47 to 3-102 (fisheries); 3-103 to 3-121 (forest vegetation); 3-21 to 3-47 (hydrology); 3-254 to 3-267 (economics); 3-267 to 3-269 (inventoried roadless areas); 3-269 to 3-271 (areas of undeveloped character).  These analyses were also set forth in specific resource reports.  AR 5782-5810, 6516-50, 6577-6603, 7204-22, 7243-7369, 7370-7480, 7539-66, 7567-7600.  Additionally, the Forest Service adopted mitigation measures that protect those resources.

1  FEIS at 2-14 to 2-20 (Table 2-3), 3-16, 3-37 to 3-42, 3-92 to 3-93, G-
2  1 to G-4.

3      **B.  NMFA CLAIM**

4          The Appeals Court determined that the Forest Service violated
5  NMFA by cutting trees ≥21 inches dbh that were not yet dead.  The
6  Appeals Court instructed the district court to grant immediately a
7  preliminary injunction to prohibit the logging of any "live tree" ≥21
8  inches dbh that currently exists in the sales areas.  In accord with
9  the "conservative definition" of a "live tree" given by the Forest
10  Service's own expert, the Appeals Court instructed that "no tree of
11  requisite size with green needles shall be harvested."  Lands Council,

12         In this final phase of litigation, after remand of the NMFA claim
13  by the Appeals Court, this Court is asked to decide whether the Forest
14  Service has violated the law by amending the Forest Plan standard
15  relating to the Eastside Screens' wildlife standard at 6d.(2)(a)
16  ("Plan Amendment").  The Forest Service amended the Forest Plan in
17  response to an invitation by the Appeals Court to define a live vs.
18  dead tree, presumably in silvicultural language rather than the common
19  meaning.

20         Plaintiffs challenge the Plan Amendment and the use of the Scott
21  Guidelines, the June 11, 2007 ESD, and the FSEIS.  The Court finds
22  that Plaintiffs' arguments are without merit.  The undersigned finds
23  that the Forest Service did not act arbitrarily and capriciously in
24  determinating the Plan Amendment was non-significant and that the
25  School Fire Project is in compliance with the Forest Plan provided the
26  Forest Service maintain all remnant late and old seral and/or

1  structural live trees  21" dbh that currently exist within stands

2  proposed for harvest activities.   The Court concludes that the School

3  Fire Project may proceed as it is consistent with the Land and

4  Resource Management Plan ("LRMP"), has been analyzed pursuant to NEPA,

5  and has been specifically approved by the responsible Forest Service

6  official. See generally 16 U.S.C. § 1604(I); *Inland Empire Pub. Lands*

7  *Council v. U.S. Forest Serv*., 88 F.3d 754, 757(9th Cir. 1996).

8       **1.  Non-Significant Amendment**

9       Plaintiffs allege that the Forest Service acted arbitrarily and

10  capriciously in determining the Plan Amendment was non-significant.

11  Plaintiffs rely on the comments of Dr. James Karr, Dr. Jerry Franklin,

12  and Dr. Richard Waring to support their contention.

13       The Forest Service responds that the Plan Amendment was not

14  significant according to the guiding criteria under the Forest Service

15  Handbook[5] and Forest Service Manual[6], which the Forest Service concedes

16  is not binding law but merely guidance for the agency to use in

17

18       [5]The Forest Service Handbook lists the following criteria: 1)timing,
19  i.e., "when the change is to take place" in relation to the next forest
    plan revision;" 2) location and size of area involved; 3) whether
20  amendment alters long-term relationship between the level of goods and
    services projected by Forest plan; and 4) whether change in management
21  prescription is only for a specific situation or whether it would also
    apply to future planning decisions.
22
       [6]The Forest Service Manual also provides examples of non-
23  significant plan amendments: 1) actions that don't significantly alter
    the multiple-use goals and objectives for long-term land and resource
24  management; 2)adjustments of management area boundaries or management
    prescriptions resulting from further on-site analysis when the
25  adjustments don't cause significant changes in the multiple-use goals and
    objectives for long-term and resource management; and 3) minor changes
26  in standards and guidelines.

ORDER ~ 31

1  amending forest plans.  Plaintiffs state, however, with respect to the
2  "timing" criteria, the Forest Service's adoption of other
3  site-specific amendments to other timber harvests underway in addition
4  to the School Fire Project amounts to one significant amendment.

5      The Court agrees with the Forest Service's finding that the Plan
6  Amendment was non-significant based on the observations that follow.
7  First, this is the 17th year of the Forest Plan and it is in currently
8  in revision.  Second, the area at issue is 28,000 acres of
9  approximately 1.4 million acres in the UNF.  Third, the district court
10 found in *Praire Wood Products v. Glickman,* 971 F.Supp. 457
11 (D.Or.1997),that the incorporation of the Eastside Screens did not
12 constitute a significant amendment to the affected forest plans.
13 Fourth, the Plan Amendment will only last for duration of the School
14 Fire Project.  Fifth, as Defendant-Intervenors argue, the Forest
15 Plan/Eastside Screen standards were silent on what constitutes a live
16 tree, and the amendment was needed to fill the gap.  Sixth, as
17 Defendant-Intervenors point out, the NFMA provides that a Forest Plan
18 may "be amended in any manner whatsoever after final adoption after
19 public notice" as provided for in 16 U.S.C. §1604(f)(4).

20     **2.  June 11, 2007 ESD**

21     Plaintiffs argue that the June 11, 2007 ESD was arbitrary and
22 capricious because it contained factual misrepresentations.  Namely,
23 Plaintiffs argue that the ESD referred to "areas that were most
24 severely burned" but Ricochet and Chicken Bone sales areas were not
25 the most severely burned and the Forest Service said the trees in
26 those two sales areas had "recently died."

ORDER ~ 32

The Forest Service, however, points out in the briefing on this matter that the ESD was accurate and properly stated that it includes the most severely burned areas of School Fire (Oli, Sun sales <u>and</u> Chicken Bone and Ricochet).  The Court does not find any merit to Plaintiffs challenge to the June 11, 2007 ESD.

### 3.  Scott Marking Guidelines

Plaintiffs challenge the use of the Scott Guidelines to determine the probability of tree survival.  Plaintiffs state that the guidelines are controversial and overestimate the mortality of a tree following a wildfire.  Plaintiffs also assert that the Forest Service did not adequately disclose the controversy over the Scott Guidelines. Plaintiffs specifically argue that the Scott Guidelines are flawed in that these guidelines greatly overstate the rate of tree death following fire.  Ct. Rec. 46, at 20.  Plaintiffs suggest, through their expert Dr. Edwin Royce, that the Ryan and Reinhardt model is better suited and more reliable for the evaluation of the probability of mortality for the trees at issue in the Project site.  First Royce Decl., ¶17.

The Defendants, on the other hand, argue that the Scott Guidelines' controversy was adequately disclosed.  Intervenors describe that whether a tree will survive a wildfire is a matter of probability, which is what Scott's Guidelines is based on.  This notion of prediction is embraced by Ryan & Reinhardt and Plaintiffs' own expert Dr. Royce as well.  The Forest Service states that it considered numerous research papers in the FEIS and FSEIS.  The Scott Guidelines are currently subject to an on-going collaborative effort

ORDER ~ 33

1    with the Pacific Northwest Research Station to conduct a 5-year

2    validation study, which has already resulted in modification to the

3    guidelines.  For instance, Amendment 2-a produces a more conservative

4    approach to assessing survival rates of Ponderosa Pine based on field

5    review.

6         Courts ordinarily defer to the Agency's determination of the

7    appropriate scientific methodology.  See *Hell's Canyon Alliance v.*

8    *USFS*, 227 F.3d 1170, 1177 (9th Cir. 2000).  Contrary to Plaintiffs'

9    position, however, at the present time there is not sufficient

10   evidence before the Court to support Plaintiffs' assertion that use of

11   the Scott Guidelines was arbitrary and capricious.  Since substantial

12   deference is given to the Forest Service's decision to resolve

13   scientific disputes as it sees fit and because scientific evidence

14   does not indicate the Scott Guidelines are fatally flawed, the Court

15   cannot find the use of this model to be improper.  *Friends of*

16   *Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 986 (9th Cir.1985).

17        It is not a violation of NEPA for the FEIS and FSEIS to rely on

18   particular scientific methodologies and studies instead of others.

19   *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 986 (9th

20   Cir.1985); see also, 40 C.F.R. § 1502.24.  The agency's choice of

21   studies on which to rely is within its discretion, and courts are

22   precluded from reviewing such decisions unless they are found to be

23   arbitrary or capricious. 5 U.S.C. § 706(2)(A).  While the Scott

24   Guidelines are the subject of critical comment, the Court cannot say

25   as a matter of law that the agency's decision to rely on the

26   guidelines is against all reason or, in other words, arbitrary and

capricious.  The Forest Service is field validating the Scott
Guidelines and reportedly fine-tuning the guidelines as more data is
learned.  The decision to use this tool is one well within the realm
of its expertise, not the Court's.  Consequently, this Court will
defer to the Forest Service's scientific methodology used until there
is sufficient and reliable research to suggest that the continued use
of the Scott Guidelines by the Forest Service flies in the face of
reason to such an extent as to be arbitrary and capricious as defined
by law.

        **3.  Snag Retention**

        Plaintiffs complain the Forest Service failed to comply with the
Forest Plan standards regarding population potential for cavity
nesting birds.  The Forest Service also allegedly failed to respond to
the significant controversy regarding its snag retention standards.
Plaintiffs urge the Court to find that the Forest Service failed to
ensure tolerance levels and population viability as required by NFMA.

        Plaintiffs state the School Fire Project does not adequately
protect primary cavity excavator species ("PCEs") such as Lewis'
Woodpecker, white-headed woodpecker, three-toed woodpecker,
black-backed woodpecker, whom are most likely to use snags for feeding
and nesting early on after a fire.  Plaintiffs find yet another
alleged fault, that being the Forest Service failed to respond to
significant new information establishing habitat requirements for
Management Indicator Species ("MIS").  Plaintiffs assert that the
Forest Service disregarded the published work of Dr. Richard Hutto
containing new scientific information that is very significant.

1  Plaintiffs use of snag retention standards of 2.84 snags per acre

2  violated NFMA by failing to ensure the viability of populations of

3  MIS.

4      Defendants, on the other hand, state that the Forest Service

5  complied with the Forest Plan, NFMA, and applicable regulations

6  because the School Fire Project meets snag retention standards under

7  the Forest Plan and Eastside Screens.  The Hutto Paper[7] relied upon by

8  Plaintiffs is not new information and does not establish a snag

9  retention standard.  The Forest Service uses Decayed Wood Advisor

10 ("DecAID") as a tool to inform the expert decisionmaking with regard

11 to the so-called tolerance levels of deadwood habitat for various

12 species of concern.  It is the best available science, argue

13 Defendants, and is a reasonable method for evaluating effects on snag

14 density.

15     The Forest Service reports that it is retaining more dead wood

16 than required under the Forest Plan.  The Forest Service ultimately

17 concluded that the Project "would provide adequate habitat for cavity

18 excavators expected to occur in the area.  A low level of assurance

19 would be available for black-backed woodpeckers indicating that the

20

21     [7]The Hutto paper, published in August 2006 after FEIS completed and
22 before ROD issued, does not set a snag retention standards.  It merely
   suggests that 200-300 snags/ hectare "may" better address the needs of
23 wildlife.  The Hutto paper did not report new research or data, it merely
   summarized existing scientific literature.  The literature cited in the
24 Hutto paper was included in the DecAID advisory tool and four scientific
   papers Dr. Hutto referred to were cited in the FEIS.  The Forest Service
25 argues that because it considered the Hutto paper, it met its obligation
   under 40 CFR §1500.1(b)
26

1   population would be maintained at the current level." EIS 3-221. *See*

2   *also* EIS 2-35; The Court defers to the Forest Service's use of this

3   tool and its conclusion that the School Fire Project would provide

4   adequate snag habitat for PCEs.

5   **VI.  Defendants' Motions to Strike**

6        At the hearing, Defendants indicated that the motions to strike

7   were moot as the documents previously viewed as being extra-record

8   materials were now part of the Administrative Record through the

9   FSEIS.

10  **VII.  Conclusion**

11       The Court finds that Plaintiffs have failed to carry their burden

12  in establishing the Forest Service acted arbitrarily, capriciously or

13  otherwise not in accordance with applicable laws relating to the

14  timber salvage project  or regarding Plaintiffs' specific objections

15  to the project.  The Court finds that the Forest Service did not

16  violate NEPA and took the requisite "hard look."  The amendment to the

17  Forest Plan as provided in the 2007 ROD is non-significant and in

18  compliance with applicable laws and regulations.  Logging of only dead

19  trees ≥21 inches dbh, as defined in the Forest Plan amendment, will

20  comply with NMFA.

21       **IT IS ORDERED**:

22       1.  Plaintiffs' Motion for Summary Judgment, **Ct. Rec. 115**, filed

23  April 13, 2007, is **DENIED**.

24       2.  Defendant Forest Service's Cross Motion for Summary Judgment,

25  **Ct. Rec. 138**, filed April 13, 2007, is **GRANTED**.

26

ORDER ~ 37

1    3.    American Forest Resource Council, Boise Building Solutions
2 Manufacturing, LLC, and Dodge Logging, Inc.'s Cross Motion for Summary
3 Judgment, **Ct. Rec. 148**, filed April 13, 2007 is **GRANTED.**

4    4.    Defendant Forest Service's Motion to Strike Declaration in
5 Support of Motion, Exhibits A-C to Second Declaration of Ralph Bloemers,
6 **Ct. Rec. 166**, filed May 11, 2007, is **DENIED as MOOT.**

7    5.    Defendant Forest Service's Motion to Strike Declaration in
8 Support of Motion, Extra-Record Declarations, **Ct. Rec. 181**, filed June
9 8, 2007, is **DENIED as MOOT.**

10    6. Defendant Forest Service's Motion to Strike Portions of Third
11 Declaration of Sean Malone, **Ct. Rec. 183**, filed June 8, 2007, is **DENIED
12 as MOOT.**

13    7. American Forest Resource Council, Boise Building Solutions
14 Manufacturing, LLC, and Dodge Logging, Inc.'s Motion for Summary Judgment
15 and to Dissolve Injunction, **Ct. Rec. 198**, filed June 29, 2007 is **GRANTED.**
16 The **temporary injunction entered on June 27, 2007** in the Court's Order
17 Re: June 18, 2007 Telephonic Status Conference and Temporary Injunction
18 Concerning the Award of Sales in the Ricochet and Chicken Bone Salvage
19 Areas, Ct. Rec. 195, is **hereby dissolved.**  The permanent injunction
20 entered on February 14, 2007 shall be modified pursuant to this order in
21 that the logging of only dead trees ≥21 inches dbh, as defined in the
22 Forest Plan amendment, will be permitted in the sales areas in compliance
23 with NFMA.

24    8.  Plaintiffs' Motion for Summary Judgment and to Permanently
25 Enjoin Proposed Forest Plan Amendment, **Ct. Rec. 200**, filed June 29, 2007
26 is **DENIED.**

ORDER ~ 38

9.  Plaintiffs' Motion TO Amend Complaint, **Ct. Rec. 206**, filed July 18, 2007 was unopposed and is **GRANTED.**

10.  The District Court Executive is directed to:

(a)  File this Order;

(b)  Provide a copy to counsel of record; and

(c)  Enter judgment consistent with this order.

**IT IS SO ORDERED.**  The District Court Executive is directed to enter this Order and provide copies to counsel.

**DATED** this 17th day of September, 2007.


                        _S/ Lonny R. Suko_
                        LONNY R. SUKO
                United States District Judge

ORDER ~ 39